# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF COLORADO
Bankruptcy Judge Joseph G. Rosania, Jr.

| | |
|---|---|
| In re:<br><br>Eric Michael Rosen,<br>SSN: xxx-xx-7509<br><br>Holli Ann Rioux,<br>SSN: xxx-xx-0555<br><br>      Debtors. | Case No. 19-16202-JGR<br>Chapter 7 |
| Douglas County Department of Human Services,<br><br>      Plaintiff,<br>v.<br><br>Holli Ann Rioux,<br><br>      Defendant. | Adv. Pro. No. 19-01292-JGR |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

      Public assistance benefits are limited in amount. It is important that they are awarded to people truly in need. The issue in this proceeding is whether Holli Ann Rioux ("Defendant") defrauded the Douglas County Department of Human Services ("DHS"), when she obtained food and Medicaid benefits by misrepresenting the composition of her household and her household gross income. Since the Court finds that she did, the debt is not dischargeable. The Court has jurisdiction over this core matter pursuant to 28 U.S.C. §§ 157(b)(1), 157(b)(2)(I), and 1334(b).

      The Court conducted a two-day trial in October 2020. The Court heard the testimony of four witnesses and admitted forty-nine exhibits. DHS called Breanna Goebel, an employee of DHS who is the Lead Eligibility Specialist ("Goebel"), Kevin Copeland, a former employee of DHS, who was the Investigation Supervisor ("Copeland"), Defendant and Eric Michael Rosen ("Rosen"). After having considered the evidence in the form of testimony and exhibits submitted at trial, the Court makes the following findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052.

**I. Findings of Fact**

<u>The Relationship</u>

Defendant was previously married to Daniel Rioux. They divorced in 2012. She has custody of four children of their marriage. Rosen was previously married to Juliana Rosen. They also divorced in 2012. Rosen has custody of one son of the marriage.

Defendant and Rosen began a romantic relationship in August 2013. They changed their statuses on their respective Facebook accounts in 2013 to reflect they were married and posted a picture of them as a married couple in 2014 (Exhibits 37 and 42).

They moved in together in March 2014 and have resided together continuously from 2014 to the date of the trial. They leased a house together in March 2016 (Exhibit 24). They bought a $30,000 vehicle together as joint owners in August 2016 (Exhibit 25). Defendant and her family were covered by health insurance provided by Rosen's employer (Exhibit 41). Defendant used the name Holli Rosen in her daughter's school parent portal. She identified Rosen as the emergency contact person with her children's school, identifying him as the stepfather of her children. She also represented that she was the guardian of Rosen's son and that Rosen's son was the sibling of her children (Exhibit 18).

Defendant used the name Holli Rosen in an employment agreement in March 2018, when she was employed as an independent contractor with ADS Precise (Exhibit 19). She identified herself as married on a DORA form (Exhibit 21, p. 7). She had a bank account in the name of Holli Rosen into which she deposited her payroll checks made payable to Holli Rosen. She also identified herself as married in 2017 in her federal W-4 income tax form (Exhibit 30). The parties have had a joint e-mail account in the names of Eric and Holli Rosen since at least March 2016.

In pleadings filed in his divorce case in state court in January and February 2019, Rosen told the state district court that Defendant was his wife and her father was his father-in-law (Exhibit 45 and 46). Rosen identified himself as married in a tax form (Exhibit 41). Rosen claimed Defendant was his spouse with his employer, Trustwave, since 2015 to obtain health insurance coverage for her and her children (Exhibit 41, p. 11). Rosen also designated Defendant as his spouse in his emergency contact information with his employer (Exhibit 41, p.14).

Defendant and Rosen filed a joint chapter 7 bankruptcy case on July 19, 2019, Case No. 19-16202, and swore under penalty of perjury they were married. In his bankruptcy schedules, Rosen also swore under penalty of perjury that he had two priority child support obligations in the total amount of $24,613 and priority tax claims for unpaid federal income taxes for the years 2016, 2017 and 2018 in the total amount of $11,455. They obtained a formal marriage license on September 19, 2019 (Exhibit 29).

Defendant and Rosen filed separate income tax returns, had separate bank accounts, and testified they never held themselves out as married to third parties.

2

Applications for Benefits

Applications for food assistance benefits are submitted under penalty of perjury. They are standard forms. Defendant first applied for benefits from DHS in December 2013 (Exhibit 1). She listed that her total household composition was five people, including four children living in the home. She was approved for benefits.

In March 2015, Defendant completed a change report for benefits because she was no longer employed (Exhibit 2). She listed the household composition as the same five people as in 2013. She identified herself as divorced and represented that no one in her home had health insurance. She was approved for benefits.

On July 12, 2017, Defendant applied for food assistance (Exhibit 5). She did not identify Rosen as her common law spouse or include his gross income. She failed to list the Jeep as an asset. She represented that no one in her home had health insurance. She was approved for benefits.

On March 29, 2018, Defendant completed a DHS application for food assistance in which she represented her household composition as five people and household income as $3,188 (Exhibit 8). She did not identify Rosen as her common law spouse or include his gross income. She did not list the Jeep as an asset. She represented that no one in her home had health insurance. She was approved for benefits.

On July 24, 2018, Defendant completed a DHS application for food assistance in which she represented her household composition as five people and household income as $3,188 (Exhibit 10). She did not identify Rosen as her common law spouse or include his gross income. She did not list the Jeep as an asset. She represented that no one in her home had health insurance. She was approved for benefits.

The parties stipulated in paragraph 10 of the pre-trial statement that from March 2018 and April 2019, Defendant received food assistance benefits in the amount of $6,248 and Medicaid benefits in the amount of $273.10, for a total of $6,521.10.

In 2018, "red flags" were raised for the eligibility specialists of DHS when they received updated employment and salary information from Defendant, after she obtained new employment and reported the same to DHS. In the new employment, Defendant applied for the employment in the name of Holli Rosen, submitted timesheets under the name of Holli Rosen and received paychecks in the name of Holli Rosen from March 2018 to April 2019 (Exhibits 19 and 20). Her handwritten note attempting to explain why she was using the name Holli Rosen is Exhibit 11.

Also, the eligibility specialists were suspicious she was married because they did not believe Defendant's monthly income was enough to pay her monthly bills and they were aware she had been living with Rosen, a common situation otherwise known as the deficit income analysis.

Witness Testimony

**Breanna Goebel.** Goebel is the Lead Eligibility Specialist for DHS in the areas of food and Medicaid benefits. Her testimony was very credible. She supervises, trains and

reviews claims forwarded by the eligibility unit employees known as eligibility workers. She testified the determination of eligibility for food assistance is determined by the household gross income limit. Generally, the composition of the household includes the applicant, the spouse of the applicant if they live together, and dependents under age 22.

She testified regarding the application process generally and Defendant's application process specifically. The application may be submitted in writing or online. The application specifically asks about marital status and whether the applicant is single, married, common law married, divorced or widowed. It also includes the gross income calculation and household expenses. After the application is submitted, there is an interview, almost always conducted by phone. The interviewer, an eligibility worker, is specifically trained to inquire about any single person living in the home and their relationship to the applicant. The applicant is required to report changes in gross income and household size and update the application every six months.

If the household gross income is above the allowed amount, no food benefits are awarded. If the household gross income is below the allowed amount, there is a calculation of benefits and food benefits are thereafter awarded. Goebel testified the reporting of household size and gross household income is a common discrepancy and gets reviewed and resolved prior to issuing benefits. Additionally, the eligibility workers are trained to review cases for "deficit income," meaning the applicant's monthly gross income is insufficient to meet monthly expenses leading to the conclusion that there must be other unreported income in the household.

In this case, the case comment from the investigative unit employee who concluded that Defendant failed to report a household member and the gross income from such member is Exhibit 9.

Goebel described the processes employed by DHS when it believes benefits are improperly obtained. The matter is referred to an investigation specialist, who reports to Goebel to determine if there is a fraud claim.

If DHS determines the amount of benefits improperly obtained is less than $10,000, the matter is an Intentional Program Violation, which is a civil matter investigated by DHS and ultimately brought before a state administrative law judge for adjudication.

If DHS determines the amount improperly claimed was more than $10,000, it is classified as a criminal matter and referred to the Douglas County District Attorney.

Since DHS determined the amount of benefits allegedly improperly obtained by Defendant was less than $10,000, the violation was classified as an Intentional Program Violation. Goebel explained the investigation process employed by DHS that concluded that Defendant misrepresented her household composition and household gross income and referred the matter to Copeland for further investigation.

**Kevin Copeland.** Copeland was employed by DHS as an investigation supervisor from June 2016 through October 2020. He had previous experience in the field in his roles as an investigator for the United States Air Force and military police officer. Like Goebel, his testimony was also very credible. He testified he had investigated

approximately 750-1,000 cases for DHS. Due to the high number of referrals, approximately 200-250 per year, he stated it took about twelve to eighteen months to investigate an Intentional Program Violation claim.

Copeland explained the investigative process he employed after receiving a referral from Goebel. He and his team speak to neighbors and review the Department of Motor Vehicles website, social media, tax returns, school records, and employment information to prepare a field report. He stated, in his tenure, approximately 60% of the referrals are "founded," which leads to the next step in the investigative process. If the violation was over $10,000 it was referred to the Douglas County District Attorney. If the violation was under $10,000, it was an Intentional Program Violation and an investigation report was generated.

In this case, the eligibility team made a fraud referral based on the red flags identified above on April 10, 2018 (Exhibit 9). Exhibit 11 is a copy of two checks made payable to Holli Rosen in March 2018 and her handwritten explanation why the checks were made payable to Holli Rosen. Exhibit 12 is Copeland's five-page field investigation report dated November 10, 2019.

The "boots on the ground" for the investigation was DHS employee Rosie Trindle, who detailed her field work and investigation at page 4 of Exhibit 12.

Copeland's testimony and investigative report highlighted four exhibits which led him to his conclusion that Defendant and Rosen held themselves out to be married on or about October 31, 2017, and that Rosen's gross income should have been included in the household gross income for the food stamps eligibility determination:

> Exhibit 42 consisted of the Facebook posts that stated that Defendant and Rosen were married on August 10, 2013, and included numerous pictures of them in their home.

> Exhibit 18 consisted of school records of Kendall Ann Rioux, which stated that her mother was Holli Rosen, her stepparent was Rosen, and included a primary household including Rosen and his son as her sibling.

> Exhibit 24 consisted of the lease for the residence which identified Defendant and Rosen as co-applicants using their joint home email account.

> Exhibit 25 consisted of a motor vehicle title document from the Colorado Department of Motor Vehicles reflecting Defendant and Rosen as co-owners of the 2016 Jeep.

The matter was slated to be presented before an administrative law judge but was stayed by Defendant's bankruptcy filing. Copeland would have been the main witness in the matter with the ultimate decision to be made by a state administrative law judge.

5

On cross examination, Copeland admitted he was not a lawyer, the parties had filed separate income tax returns, and he had not obtained or reviewed bank records or reviewed the food assistance applications.

**Defendant**. Defendant was evasive and not credible. She had been employed as an administrative assistant and certainly appeared capable of understanding the applications. She maintained accurate time records for her employer (Ex. 20). She was unable to deny any of the key facts set forth in the investigative report.

The theory of her defense was that she was in a fluid family situation, so it was difficult to define the composition of her household at any point in time, and that she and Rosen were simply housemates.

Her defenses can be summarized as follows. First, the eligibility workers were aware Rosen was her housemate and told her everything was fine so long as she kept and prepared the food purchased using the food assistance benefits for her family separate from Rosen and his son. Second, the reason for the August 2013 Facebook post was that she and Rosen were being stalked by their former spouses, and they were seeking to deter continued attention from the former spouses. Third, the federal bankruptcy trustee declared the parties were married during her bankruptcy hearing. Fourth, the parties did not file joint income tax returns or have joint bank accounts. Fifth, she used the name Holli Rosen for her employer because she was going to get married to Rosen, but the parties kept delaying the marriage due to financial difficulties. Sixth, neither she nor Rosen ever held themselves out as married to third parties.

**Rosen**. Rosen was also evasive and not credible. He admitted he and his son moved into the home of Defendant's parents, with Defendant, in March 2014. He admitted the parties leased a home together in 2016. He admitted he was denied food assistance benefits because his gross income was too high and because he was unable to deduct his monthly child support obligation from the gross income calculation. He admitted he told his employer he was married to Defendant on a federal income tax form he submitted to his employer (Exhibit 41, p. 14). He was unable to deny that his company could not have provided health insurance benefits to Defendant and her children unless they were married.

He stated the parties were told by a federal judge they were married in a hearing held in their bankruptcy case approximately one month after the filing of the bankruptcy case, even though the parties swore under penalty of perjury they were married in their bankruptcy petition, which is the document which initiates the bankruptcy filing.

The most damaging evidence for which he did not have any explanation was contained in Exhibits 45 and 46. Exhibit 46 is a disclosure of expert and lay witnesses filed in the Douglas County District Court on January 4, 2019, in a domestic-relations action entitled *In re the Marriage of Rosen,* 11 DR 00914, in which he identified Greg Shettlesworth, Defendant's father, as his father in law to the state district court.

Exhibit 45 is a supplemental disclosure dated February 8, 2019, filed in the same civil action in which Rosen identified Defendant, Holli Rosen, as his wife to the state district court.

## II. The Bankruptcy Case and Adversary Proceeding

On July 19, 2019, Debtors filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code.

Plaintiff timely commenced the instant adversary proceeding against Defendant on October 18, 2019.

## III. The Motion to Amend

The complaint was a one count complaint under 11 U.S.C. § 523(a)(2) for fraud. DHS did not specify whether it was proceeding under §§ 523(a)(2)(A) or (B). In closing argument, Defendant requested dismissal of the complaint for DHS failure to plead a claim under § 523(a)(2)(B). Defendant argued that the only claim DHS could make under the facts it presented at trial was for fraud in the use of a written statement respecting Defendant's financial condition, which claim was not adequately set forth in the complaint. This was the first time Defendant had raised this issue in this case. Defendant did not object to the introduction of any evidence, stipulated to the admissibility of forty-nine exhibits and did not raise this issue in the pre-trial statement. After receiving briefs from the parties, on February 26, 2021, the Court granted the oral motion of DHS to amend the complaint to conform to the evidence to permit the complaint to be amended to add a claim under § 523(a)(2)(B). The Court provided Defendant the opportunity to present additional evidence in support of any defenses to the amended complaint, which she declined.

## IV. Conclusions of Law

### A. Common Law Marriage

<u>Legal Standards</u>

The Colorado Supreme Court recently revised the test for proving common law marriage in the case of *Hogsett v. Neale,* 478 P.3d 713 (Colo. 2021). The Colorado Supreme Court noted that Colorado and only nine other states allow common law marriage. In *Hogsett,* the Colorado Supreme Court reviewed the various factors and found that since one party did not believe in marriage and the parties had not held themselves out as a married couple to third parties, the parties were not common law married, despite other indicia of a marital relationship. *Id.* at 725-27. The Colorado Supreme Court stated that the key inquiry is whether the parties have a mutual intent to be in a marital relationship. *Id.* at 724.

The Colorado Supreme Court opined that the courts can consider a number of factors in making the determination, including the parties' cohabitation, reputation in the community as spouses, joint bank accounts and credit cards, purchase and ownership of joint property, joint tax returns, use of surnames, leases in both partners names, emergency contact designations, the couples' references to each other, and their beliefs regarding the institution of marriage. *Id.* at 724-25.

Finally, the Colorado Supreme Court emphasized the analysis is fact intensive, relies on evaluating the totality of the circumstances, and is performed on a case-by-case basis. *Id.* at 725, 727.

### Application of the Test

The evidence is overwhelming that the parties were common law married, at least as of October 2017. They were eligible to be married because they were both divorced. They exhibited mutual intent to be in a marriage relationship. They identified themselves as common law married on every important document other than the applications for food assistance and income tax returns. They identified themselves as married to two courts.

They certainly believed in the institution of marriage. They were both previously married. They posted that they were married to each other on Facebook in 2013. They have lived together continuously since 2014. They leased a house together. They purchased a vehicle together. Rosen's health insurance covered Defendant and there could not be coverage unless she was his spouse. Defendant used the name Holli Rosen with her employer and received payroll checks in that name. They used each other as emergency contacts with their respective children's schools and employers. They filed a joint bankruptcy petition and under oath represented themselves to this Court to be married. Rosen's identification of Defendant as his spouse and her father as his father in law to the state district court was undisputed.

Their defenses are not persuasive. If they were getting stalked by their former spouses, a reasonable person would have reported the conduct to the local police rather than only changing their Facebook relationship statuses. The alleged statements made by the eligibility workers that everything was acceptable if Defendant kept the food purchased separate from Rosen and his son is not supported by the evidence. Goebel testified the issue of household composition comes up frequently and the eligibility workers are trained in this area and would never have made the statements that everything was acceptable if she kept and prepared the food separate from Rosen and his son.

The federal bankruptcy trustee did not declare them as married; they did so by checking the "married" box in their petition, which was filed before the trustee was even appointed. Two people cannot file a joint petition unless they are married. They held themselves out as married to Rosen's employer to obtain valuable health insurance benefits. The excuse that they were delaying the marriage due to financial difficulties stretches credulity.

They claim that their practice of keeping separate bank accounts and filing separate income tax returns proves they were not common law married. These are only two factors in the analysis. The Court surmises a plausible explanation for why they kept separate bank accounts and filed separate income tax returns was because Rosen owes significant child support (not a "small balance" as he testified) and income taxes, such that any potential income tax refunds and money in bank accounts were subject to seizure and garnishment. A child support garnishment of Rosen's wages is contained in Exhibit 44. By filing separate taxes and keeping separate bank accounts, Defendant's income

was not garnished and she received and federal and state income tax refunds in 2017 and 2018 (Exhibits 14 and 30).

Finally, their self-serving testimony that they did not hold themselves out as married to third parties is contradicted by the documentary evidence.

### B. 11 U.S.C. § 523(a)(2)(A)

11 U.S.C. § 523(a)(2)(A) provides, in pertinent part, that a Chapter 7 debtor is not discharged from any debt for money or services to the extent that such debt was obtained by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." To establish a non-dischargeable claim under 11 U.S.C. § 523(a)(2)(A), a creditor generally must prove the following:

> [(i)] the debtor made a false representation; [(ii)] with the intent to deceive the creditor; [(iii)] the creditor relied on the false representation; [(iv)] the creditor's reliance was justifiable; and [(v)] the false representation resulted in damages to the creditor.

*In re Denbleyker*, 251 B.R. 891, 895 (Bankr. D. Colo. 2000) (citing *Field v. Mans*, 516 U.S. 59, 71 (1995); *Fowler Brothers v. Young (In re Young)*, 91 F.3d 1367, 1373 (10th Cir. 1996)).

The level of reliance required under 11 U.S.C. § 523(a)(2)(A) is the lower standard of justifiable reliance. *See Field v. Mans*, 516 U.S. 59 (1995). Because Debtor's statements were in writing and respected her financial condition, 11 U.S.C. § 523(a)(2)(A) does not apply. *See Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752, 1759-60 (2018). Accordingly, this claim is dismissed.

### C. 11 U.S.C. § 523(a)(2)(B)

11 U.S.C. § 523(a)(2)(B) provides, in pertinent part, that a Chapter 7 debtor is not discharged from any debt for money or services to the extent that such debt was obtained by use of a written statement that was:

> (i) … materially false; (ii) respecting the debtor's or an insider's financial condition; (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and (iv) that the debtor caused to be made or published with intent to deceive….

11 U.S.C. § 523(a)(2)(B) requires that statements "respecting the debtor's or an insider's financial condition" be written. *See Lamar*, 138 S. Ct. at 1752. The level of reliance required under 11 U.S.C. § 523(a)(2)(B) is the higher standard of reasonable reliance.

9

The various food and Medicaid assistance applications were statements in writing respecting Defendant's financial condition. That is the precise purpose of the applications. They were materially false in several respects.

They were materially false because Defendant failed to include her common law husband as part of her household composition. They were false because Defendant failed to include Rosen's gross income in the calculation of household gross income. They were false because she failed to identify she and her children were covered by Rosen's health insurance. They were false because she failed to identify the jointly owned Jeep as an asset. Finally, they were false because she misrepresented her monthly gross income in the July 2018 application.

DHS reasonably relied on the content of the applications, made under penalty of perjury. The eligibility workers reviewed the applications. They checked the information in the applications on various websites and verified income with documents. The eligibility workers followed up with telephone interviews and kept notes of the interviews (Exhibits 3 and 6). They did all they could do to verify the information. They acted as a prudent person would in reviewing the applications and supplemental written information provided by Defendant. DHS promptly initiated a fraud investigation.

Defendant published the statements with the intent to deceive. This is established by the wide scope of the misrepresentations over an extended period, which included not only failing to indicate the fact of common law marriage but also failing to list the Jeep and health insurance coverage, and misrepresenting income. If these items were set forth in the applications, DHS certainly would have inquired further into the nature of the relationship between the housemates. Goebel testified household composition and deficit income are two common situations for which she trains the eligibility workers.

Further, the parties stipulated in paragraph 11 of the pre-trial statement that the combined income of Defendant and Rosen during the relevant time period when Defendant received food assistance and Medicaid benefits was over $130,000, which was well above the gross income eligibility threshold for a household of that size to receive such benefits. Any inference that these representations were merely unintentional or isolated errors is unreasonable; Defendant benefitted from the misinformation.

Defendant obtained money by use of a materially false written statement. Thus, the Court finds DHS was damaged by the fraud in extending food stamp benefits to Defendant in the amount of $6,248 and Medicaid benefits in the amount of $273.10.

**V.   Conclusion**

Based upon the above findings of fact and conclusions of law,

IT IS ORDERED that judgment shall enter in favor of Plaintiff Douglas County Department of Human Services and against Defendant Holli Ann Rioux/Rosen for a nondischargeable debt in the amount of $6,521.10 under 11 U.S.C. § 523(a)(2)(B).

IT IS FURTHER ORDERED that judgment shall enter in favor of Defendant Holli Rioux/Rosen and against Plaintiff Douglas County Department of Human Services on the claim under 11 U.S.C. § 523(a)(2)(A).

IT IS FURTHER ORDERED that within thirty days of the date of this Order, Plaintiff Douglas County Department of Human Services shall, pursuant to 28 U.S.C. § 1920, Federal Rule of Civil Procedure 54(b) and Federal Rule of Bankruptcy Procedure 7054, file a bill of costs containing its total taxable costs incurred in this adversary proceeding.

IT IS FURTHER ORDERED that the Clerk of the Court shall enter judgment accordingly.

Dated this 2nd day of August, 2021.

BY THE COURT:

_____
Joseph G. Rosania, Jr.
United States Bankruptcy Judge